KIRKLAND & ELLIS LLP
Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
R. Alexander Pilmer (SBN 166196)
apilmer@kirkland.com
Michael J. Shipley (SBN 233674)
michael.shipley@kirkland.com
333 South Hope Street
Los Angeles, California 90071
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500

*Attorneys for Plaintiffs Ovation Finance Holdings 2 LLC; Ovation Fund Management II, LLC; Banc of California, N.A.*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **OVATION FINANCE HOLDINGS 2 LLC; OVATION FUND MANAGEMENT II, LLC; BANC OF CALIFORNIA, N.A.;** <br><br> **Plaintiffs,** <br><br> v. <br><br> **CHICAGO TITLE INSURANCE COMPANY; CHICAGO TITLE COMPANY** <br><br> **Defendants.** | Case No.: **'19CV2031 GPC KSC** <br><br> **COMPLAINT FOR: (1) RICO, 18 U.S.C. § 1962(c); (2) RICO CONSPIRACY, 18 U.S.C. § 1962(d); (3) FRAUD; (4) AIDING AND ABETTING FRAUD; (5) NEGLIGENT MISREPRESENTATION; (6) BREACH OF FIDUCIARY DUTY; (7) NEGLIGENCE** <br><br> **DEMAND FOR JURY TRIAL** |

NOW COME Plaintiffs Ovation Finance Holdings 2 LLC; Ovation Fund Management II, LLC; and Banc of California, N.A. (collectively, "Plaintiffs"), through their counsel, and for their Complaint and Jury Demand, state:

### INTRODUCTION

1.     Plaintiffs have lost more than $75 million in connection with a brazen fraudulent and criminal scheme orchestrated by Gina Champion-Cain, operating through a company called ANI Development, LLC ("ANI"), and with the full knowledge and cooperation of defendants Chicago Title Insurance Company ("CTIC") and Chicago Title Company ("CTC") (collectively, "Chicago Title"). Beginning no later than 2015, and continuing until September 2019, Champion-Cain, Chicago Title, and senior escrow officers at Chicago Title participated in scores of acts of criminal wire fraud in connection with obtaining hundreds of loans under false pretenses. Hundreds of millions of dollars flowed through this criminal enterprise.

2.     Applicants for California liquor license transfers are required to keep the purchase price of the license in escrow until they obtain regulatory approval of the transfer. Champion-Cain purportedly developed the "ANI Loan Program," which would lend funds to these applicants at high interest rates so they could satisfy the escrow requirement.

3.     Plaintiffs provided a source of funds to finance the ANI Loan Program. Champion-Cain, ANI, and Chicago Title specifically represented—via telephone calls, face-to-face meetings, e-mail correspondence, and signed representations—that funds lent to each applicant would be maintained by Chicago Title in an independent escrow account solely for the benefit of lenders like Plaintiffs. When an applicant's transfer was approved, the applicant would fund the transfer and the escrowed funds would be returned to the lenders, with interest.

4.     Chicago Title's role in holding the lenders' escrowed funds was essential to Plaintiffs' decisions to lend money to support the ANI Loan Program. Indeed, the key feature of the ANI Loan Program was that a lender's funds would be held in escrow

with a highly regarded institution like Chicago Title and could not be disbursed to any party other than the lender, which virtually guaranteed that the lenders' principal would be safely returned. Had Plaintiffs known that the arrangement was otherwise, they would never have lent funds to the ANI Loan Program.

5. But the truth was far different than represented to Plaintiffs. In fact, Champion-Cain, ANI, and Chicago Title never established the separate escrow accounts for the sole benefit of lenders. Instead, they created a single account at Chicago Title that provided Champion-Cain and ANI with the unfettered ability to withdraw all of the money at any time and for any reason. They then deceived the lenders into wiring loaned funds into that account.

6. Champion-Cain and her co-conspirators at Chicago Title collectively established ANI as a criminal enterprise whose purpose was to defraud victims out of tens of millions of dollars. Each of these entities reaped handsome profits from their criminal scheme before it was shut down by federal law enforcement in September 2019.

7. Champion-Cain utilized Plaintiffs' money to fund a lavish lifestyle, to build her reputation through professional and charitable organizations, to create the façade that she was an upstanding member of the community, and to make unauthorized investments in real estate, restaurants, and other businesses.

8. Chicago Title was either paid $1,000 for every escrow it was represented to have established (as represented by ANI) or $500 each time Champion-Cain withdrew money from the account. Additionally, Chicago Title earned significant commissions and fees in connection with providing escrow and title insurance services in connection with Champion-Cain's other unauthorized investments made with Plaintiffs' money.

9. And Chicago Title's escrow officers were paid tens of thousands of dollars personally by Champion-Cain to secure Chicago Title's aid and participation in the fraudulent scheme. *See* Ex. 9 (checks from Champion-Cain to Chicago Title officers

Della DuCharme and Betty Elixman for "gifts"). That was on top of the commissions, bonuses and other compensation Chicago Title's escrow officers earned from Chicago Title while steering hundreds of millions of dollars through a single account at Chicago Title.

10.     Plaintiffs bring this case to recover their substantial losses caused by Chicago Title's fraudulent activity, racketeering, and gross negligence. Chicago Title is liable to Plaintiffs for fraud, aiding and abetting fraud, for treble damages on account of its active participation in a criminal enterprise pursuant to RICO, and punitive damages.

## THE PARTIES

11.     Ovation Finance Holdings 2 LLC ("Ovation Finance") is a Nevada limited liability company with its principal place of business in Austin, Texas. Ovation Finance is an investment vehicle held by a private equity fund that specializes in making investments in private credit markets.

12.     Ovation Fund Management II, LLC ("Ovation Management") is a Delaware limited liability company with its principal place of business in Austin, Texas. Ovation Management is the general partner of the funds that hold Ovation Finance. Ovation Management and Ovation Finance may sometimes be referred to collectively herein as "Ovation."

13.     Banc of California, N.A. ("Banc of California") is a National Association with its principal place of business in Santa Ana, California. Banc of California is a full-service, midsize bank focused on California. It provides innovative banking and lending products to diverse businesses, entrepreneurs, and communities throughout California.

14.     CTC is a California corporation with its principal place of business in Los Angeles, California. Together with Chicago Title Insurance Company, CTC provides various real estate-related financial services, including escrow agent services.

15.     CTIC is a Florida Corporation with its principal place of business in Jacksonville, Florida. Together with CTC, CTIC provides various real estate related financial services, including escrow agent services.

16.     CITC and CTC are agents, alter egos, and instrumentalities of one another. They are under common ownership. They share the same officers and use the same website on the Internet. In connection with the acts stated herein, they operated in a consolidated manner whereby a member of the general public dealing with Chicago Title would be unable to ascertain which specific entity he, she, or it was doing business. Recognizing the corporate separateness between CITC and CTC would sanction fraud and render injustice on Plaintiffs.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 18 U.S.C. § 1964 and 28 U.S.C. § 1331.

18.     Venue in this district is proper under 18 U.S.C. § 1965(b) and 28 U.S.C. § 1391(b)(2) in that each defendant can be found in this judicial district and a substantial part of the events alleged herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

**I.     The Represented History, Structure, and Function of the ANI Loan Program.**

19.     Gina Champion-Cain was a prominent San Diego real estate developer and restaurateur. She is also a criminal and a fraudster. As a subsidiary to her development company, American National Investments, Champion-Cain created ANI. ANI was supposed to make high interest loans to liquor license applicants. Beginning in 2012, ANI began to obtain financing from third-party lenders from which Champion-Cain would supposedly finance these loans.

20.     Section 24074 of the California Business & Professions Code requires an applicant for the transfer of an alcoholic beverage license to establish an escrow account and deposit with the escrow holder the full amount of the purchase price or consideration while the application is pending. Depending on location and type, a liquor license can cost upwards of $400,000 and the application can take upwards of a year to process.

21.     Champion-Cain purportedly knew and worked with an attorney (the "ABC Lawyer") who specialized in obtaining liquor licenses for his clients, many of whom had difficulty funding the escrow. Restaurant and store owners often do not have sufficient capital to leave large amounts of money sitting in an escrow account for a lengthy period of time. Accordingly, Champion-Cain's purported plan was to offer the ABC Lawyer's clients short-term loans in exchange for relatively high rates of interest. According to Champion-Cain, the ABC Lawyer could send her a substantial amount of business.

22.     In 2012, Champion-Cain began to solicit and obtain financing for these transactions.

23.     This financing was structured such that a third-party lender would deposit funds directly into an account maintained by Chicago Title only after Champion-Cain provided the lender with information regarding the applicant name and license number of the application. Champion-Cain also provided the lender with an escrow agreement signed by Champion-Cain and by an escrow officer at Chicago Title. Under the escrow agreement (the "Form Escrow"), the funds being deposited by the lender could only then be used and to fund a single, specific liquor license escrow. The lender was a stated third-party beneficiary of the Form Escrow, which prohibited Chicago Title from releasing the escrowed loan amount to anyone other than the lender or using the funds for any other purpose. When the application was granted, Chicago Title would return the principal to the lender, with the lender also to receive its agreed share of the interest, returning the balance of the interest to Champion-Cain. This arrangement was designed to secure lenders' funds and make certain they were never at serious risk.

24.     The lenders' confidence in the safety of their principal sitting in escrow accounts at Chicago Title was further assured by the extensive regulation of escrow companies under the California Escrow Law, Cal. Fin. Code § 17000, *et seq*, and the fact that escrowed funds are insured through the Escrow Agents' Fidelity Corporation and additional state-law bonding requirements. *See* Cal. Fin. Code § 17314.

25.     Champion-Cain's first lender was Kim Peterson, a high net-worth real estate developer Champion-Cain knew from San Diego real estate circles. Peterson, with the assistance of counsel, drafted the original Form Escrow.

26.     After a few years of funding loan escrows with his own money, in 2015, Peterson began to solicit additional third-party lenders to obtain financing for these transactions.

27.     In 2015, Champion-Cain formed ANI as a limited liability company to serve as a single purpose vehicle for the escrow lending business. Peterson formed a new entity of his own, Kim Funding, LLC ("Kim Funding"), as a vehicle to obtain financing to fund additional loans through ANI. Kim Funding had a contractual right to 80 percent of ANI's profits and held a 1 percent equity stake in the company.

28.     Ovation Finance and Banc of California lent money to ANI through Loan Agreements with Kim Funding. *See* Ex. 1 (Ovation/Kim Loan Agreement); Ex. 2 (Banc of California/Kim Loan Agreement).[1] The Ovation/ Kim Loan Agreement attached the Form Escrow to be used in connection with the loans. *See* Ex. 1 at p. 18 (form escrow agreement). Simultaneously with the execution of the Loan Agreement, Ovation Finance also executed a Side Agreement with ANI. *See* Ex. 3 (Ovation/ANI Side Agreement). The Side Agreement recited that "[i]t is expressly understood by ANI that it may only release the Deposit (as defined in the Form Escrow) to Ovation and shall not take any action to contravene this Side Letter." Ex. 3 at p. 1. The Form Escrow explicitly referenced in the Side Agreement and the Loan Agreement was to an individual Escrow Agreement between ANI and Chicago Title Company, following the Form Escrow, for an individual license applicant. *See* Ex. 1 at pp. 18–20. The Banc of California/Kim Loan Agreement references the Escrow Agreement and includes an

---

[1] A First Amendment to Loan Documents between ANI, Kim Funding and Banc of California dated February 27, 2019, and related documents, were executed in connection with an increase in the principal loan amount from $25,000,000 to $35,000,000 (the "Banc of California/Kim Amended Loan Agreement.") *See* Ex. 11.

executed Commercial Guaranty, Commercial Security Agreement and Assignment of Deposit Account executed by ANI, under which ANI granted to Banc of California, *inter alia*, a security interest in all escrow accounts established by ANI and funded by Banc of California.[2] *See* Ex. 2 at pp. 28–59.

29.    Banc of California's Security Agreement with ANI acknowledged that "[ANI] and [Kim Funding] are parties to that certain Funding Agreement, dated as of January 16, 2015, providing for the establishment of escrow accounts by [ANI] from time to time with Chicago Title, a California corporation ('Escrow Holder') in connection with the representation by [ANI] of applicants for a transfer of a license by the California Department of Alcohol Beverage Control, and the funding of such escrow accounts by [Kim Funding]." Ex. 2 at p. 45. ANI pledged the accounts funded by Kim Funding as collateral, and represented and warrantied that ANI held good title to the accounts. Ex. 2 at pp. 45–46.

30.    The Escrow Agreements utilized in connection with the Banc of California/Kim Loan Agreement were individual, customized Escrow Agreements between ANI and Chicago Title Company, following the Form Escrow, for each individual license applicant. *See* Ex. 1 at 18–20; Ex. 4. For each individual application escrow to be funded by a lender, Kim Funding would pass along specific application information, along with specific Form Escrows, that would fill in the name of the applicant, the amount loaned by ANI, and the license number for which the loan was made. When the loan was ready to close, the lender would fund the escrow by wiring the money into a Chicago Title account. Chicago Title was then supposed to file a form called an "ABC-226" with the California Department of Alcoholic Beverage Control, confirming that the applicant's funds—which had been loaned by ANI and its lenders—were in an escrow account.

---

[2] An updated Commercial Guaranty provided by ANI is included within the Banc of California/Kim Amended Loan Agreement.

31.     As designed, after the liquor license transfer application was granted, the applicant would wire the funds, along with the agreed interest, to Chicago Title. ANI was then supposed to provide instructions to Chicago Title to release back to the lender the principal and the amount equal to the interest charged by the lender. The remainder of the interest would be split between Kim Funding and ANI on a 80/20 basis.

32.     The following diagrams illustrate how the lending was represented to work:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## II.   Ovation Finance's Lending to the ANI Loan Program.

33.    Ovation Finance's business strategy principally entails private market lending. In mid-2017, Kim Funding presented the ANI Loan Program opportunity to Ovation. The ANI Loan Program seemed attractive to Ovation because it afforded a 10 percent rate of return without placing the principal at significant risk.

34.    As part of its diligence, Ovation requested confirmation that the funds for the applicants' escrow would, in fact, be held in escrow accounts in the name of Ovation Finance and controlled by Chicago Title. On June 27, 2017, Peterson provided a June 23, 2017 e-mail from Betty Elixman ("Elixman"), an escrow officer at Chicago Title, to Champion-Cain, representing that "we were at 301 escrows totaling $61,370,000." The e-mail was sent from betty.elixman@chicagotitleescrows.com.

1
2
3
4
5
6
7
8
9
10
11

---------- Forwarded message ----------
From: **Betty Elixman** <betty.elixman@chicagotitleescrows.com>
Date: Fri, Jun 23, 2017 at 2:25 PM
Subject: Escrows
To: Gina Champion-Cain <gina@americannationalinvestments.com>

Hi Gina.

Before yesterday's closings and today's wires, we were at 301 escrows totaling
$61,370,000.

Have a nice weekend.

Best,
Betty

--
Betty Elixman, Escrow Officer
Chicago Title & Escrows
701 B Street, Suite 1120
San Diego, CA  92101

DuCharme Unit:
Della DuCharme
Betty Elixman

12  35.     During its diligence, Ovation further confirmed that Della DuCharme

13  ("DuCharme")—who Kim Funding represented to be the lead escrow officer on the

14  account—was, in fact, a Senior Commercial and Industrial Escrow Officer at Chicago

15  Title. (Her biography was posted on Chicago Title's website.)

16  36.     Ovation also spoke on several occasions with attorneys representing Kim

17  Funding. One of these attorneys—a leading specialist in California alcoholic beverage

18  regulation—provided a letter opining on the legality of the escrow arrangement under

19  California alcoholic beverage laws. Another explained that based on the way the ANI

20  Loan Program was structured, the only credit risk to the lender's principal was if

21  Chicago Title effectively committed fraud or somehow exposed the escrow accounts to

22  third parties.

23  37.     On July 16, 2017, Ovation's investment committee approved the

24  transaction.

25  38.     On July 17, 2017, after several rounds of negotiation and drafting, Ovation

26  Finance and Kim Funding (defined in the agreement as the "Company") executed a

27  Loan Agreement (which was dated as of four days prior), for a $25 million line of

28

credit. Ex. 1. Under Section 1.2 of the Loan Agreement:

> Section 1.2    Use of Proceeds. The Company represents, warrants and agrees that the proceeds of each Loan will be solely used to directly fund the Escrow Accounts of persons or entities (each a "**License Applicant**") seeking authorization from the California Department of Alcoholic Beverage Control (the "**ABC**") to acquire by transfer a license issued by ABC. Ovation is hereby directed to deposit funds subject to this Loan Agreement directly into such Escrow Accounts as instructed by Company.

39.    A copy of the Form Escrow to be used was attached to the Loan Agreement as an exhibit.

> **Exhibit B**
>
> Escrow No. 66061-DD [for 2017 escrows]
>
> Chicago Title Company
> 701 B Street, Suite 760
> San Diego, California 92101
>
> **ESCROW AGREEMENT**
> (Holding Funds)
>
> This Escrow Agreement ("Agreement") is made and entered into as of _____, 2017, by and between ANI Development, LLC, a California limited liability company ("Lender"), and Chicago Title Company, a California corporation ("Escrow Holder").
>
> R E C I T A L S
>
> Lender desires to deposit certain funds and direct others to deposit certain funds (the "Deposit") into this Escrow and to provide Escrow Holder with written instructions setting forth the conditions under which Escrow Holder will invest and hold the funds and ultimately disburse them.
>
> Lender and Escrow Holder understand that this is a limited escrow only and is being opened for the benefit of _____ ("Applicant"), who is applying for approval of a transfer to Applicant of a license issued by the California Department of Alcoholic Beverage Control ("ABC") under Business and Professions Code sections 24070-24082.  The license that is the subject of Applicant's application to ABC is License No. _____ ("the License").
>
> NOW, THEREFORE, the parties agree as follows:
>
> A G R E E M E N T S
>
> Deposit.  Within five business days following the date this Agreement is signed by Lender and Escrow Holder, Lender will cause to be deposited a total sum of $_____ (the "Deposit") with Escrow Holder for the refundable deposit for Applicant's application to ABC for approval of transfer to Applicant of the License.  The source of funds for the Deposit shall be from an account at _____ in the name of Ovation Finance Holdings 2 LLC, a Nevada limited liability company ("Ovation").  Escrow Holder will do the following:
>
> Invest Funds.  Place the Deposit into an interest-bearing account with all interest accruing to the account of Lender. Concurrently herewith, Lender will provide Escrow Holder with the required IRS Form W-9 and Investment Instructions required to establish such account.
>
> 226 Form.  Escrow Holder shall send to ABC a completed Form 226 upon Escrow Holder's receipt of the Deposit.
>
> Primerica/ABC-Ovation Loan Agreement V6 7-13-17          **Exhibit B**

40.    Under the Form Escrow, Chicago Title and ANI agreed that Ovation Finance remained the owner of the loaned principal, which would only be released to Ovation Finance.

Ownership of Deposit.  It is acknowledged and understood that only Ovation has an ownership interest in the Deposit and that Lender has no ownership interest in the Deposit and has no right to direct the disposition of the Deposit except as set forth in and as provided in the Release of Deposit paragraph as follows.

Release of the Deposit.  At any time, Lender may provide written instructions to Escrow Holder to release all of the Deposit and the interest thereon only to the account set forth below.  During the term of this Escrow, upon the written instructions from Lender, Escrow Holder will disburse the Deposit and, as instructed by Lender, interest thereon at ten percent (10%) per annum only to the following account:

Wells Fargo Bank

41.     At the same time the Loan Agreement was executed, Ovation Finance entered a Side Agreement directly with ANI. Ex. 3. Under Section 1.1 of the Side Agreement:

Section 1.1     Instructions to Escrow Agent.  ANI shall instruct the Escrow Holder to pay to Ovation from each applicable Escrow Account all amounts due and owing with respect to a Loan on the Due Date of such Loan.   In furtherance thereof, ANI agrees to comply with all of its obligations under each Escrow Agreement, including without limitation its obligation to provide written instructions to Escrow Holder to release all of the Deposit and the interest thereon to Ovation at each such Due Date.  It is expressly understood by ANI that it may only release the Deposit (as defined in the Escrow Agreement) to Ovation and shall not take any action to contravene this Side Letter.  It is further understood that in an Event of Default (as defined in the Loan Agreement), if Kim Funding replaces the Deposits (as defined in the Escrow Agreement) as set forth in Section 6.2 of the Loan Agreement, ANI shall instruct the Escrow Holder to release the Deposits that have been replaced back to Ovation in accordance with the Escrow Agreement (it being understood that nothing herein is intended to require ANI to do anything that violates applicable law or ANI's agreement with an applicant).

42.     Also, on July 17, 2017, Kim Funding made its first funding request to Ovation Finance, for an initial $10 million draw on the line of credit. Kim Funding's request attached fifty-two executed Form Escrows. Each listed an individual applicant, a license number, and was signed by Champion-Cain on behalf of ANI and by Elixman on behalf of Chicago Title. The agreements were delivered in two e-mails. The e-mail threads originated with Elixman's putative e-mail address at betty.elixman@chicagotitleescrows.com, and were forwarded, first through Champion-Cain and then Peterson, to Ovation.

43.     On July 19, 2017, before Ovation Finance initiated its first wire transfer to Chicago Title, counsel for Ovation asked Peterson if there was someone at Chicago Title who could confirm that Ovation Finance's principal would be safeguarded in separate escrow accounts under which funds could not be released without its consent.

Peterson responded that "all contact with CT needs to go through us." Ovation, however, insisted that, because of the amount of money at issue, it would not fund prior to speaking live with someone from Chicago Title. Peterson eventually set up a conference call between Ovation, Champion-Cain, and DuCharme for the following day.

44.     On July 20, 2017, at noon central time, Ovation's Chief Financial Officer and its Vice President of Finance and Accounting initiated the conference call. First, they called Champion-Cain. Then Ovation added DuCharme to the call, having already confirmed that the telephone number provided for her was a listed number in Chicago Title's San Diego offices.

45.     After introductions, Ovation's CFO explained that Ovation was about to wire Chicago Title $10 million and he wanted to be sure that the money would be safely handled to ensure that Ovation was wiring to a Chicago Title escrow in Ovation's name that Ovation controlled. DuCharme confirmed that Chicago Title would be placing the money in an escrow account in Ovation's name. Ovation's CFO then confirmed the names of the entities sending and receiving the wire, the account and wire information, and the escrow number that was printed on the top of each of the escrow agreements Ovation had received from Kim Funding three days prior; DuCharme confirmed these details. Following the call, Ovation believed that the safety of its deposit was ensured.

46.     Chicago Title's role in holding Ovation's funds played a crucial role in Ovation's decision to enter the Loan Agreement with Kim Funding and to fund loans under it. Indeed, the key feature of the ANI loan was that under the Form Escrows, with a highly regarded institution like Chicago Title holding the funds, the lenders' principal appeared to be completely safe. If Ovation had not received confirmation that Chicago Title would be acting under the terms of Form Escrows to keep Ovation's principal safely held in escrow accounts that only Ovation had the authority to receive withdrawals from, Ovation would not have agreed to loan money to Kim Funding or to wire any funds into the accounts controlled by Chicago Title.

47.     Following Chicago Title's confirmation, and in reliance on the details Chicago Title confirmed, Ovation Finance funded its first $10,000,000 loan. By December 1, 2017, consistent with expectations set prior to the original funding, Kim Funding had requested, and Ovation Finance funded, the entire $25,000,000 available under the Loan Agreement. As with the first round, each round of new funding was accompanied by copies of the Form Escrow agreement executed by Elixman and Champion-Cain, and naming specific applicants, license numbers, and amounts. Ultimately, between July 20, 2017 and August 8, 2019, Ovation Finance wired thirty-one tranches of loans to Chicago Title, purportedly to fund 255 liquor license application escrows arranged by ANI. *See* Ex. 5 (table tracking wires and escrows). As certain of the loans were purportedly repaid, Kim Funding would provide new escrows into which Ovation Finance would then re-loan money.

48.     On January 17, 2018, as part of Ovation's annual independent audit, Ovation Finance's auditors at KPMG addressed an audit confirmation letter from Ovation's CFO to DuCharme at Chicago Title's San Diego Office. Ex. 10. The letter stated that, "[a]ccording to our records, as of the close of business on December 31, 2017, Chicago Title held in escrow $25,000,000 in the name of Ovation Finance Holdings 2 LLC per the License List and Amounts, as set forth in Exhibit A attached hereto." An attachment to the January 17, 2018 correspondence included a list of 123 different escrows, by license number, commencement and funding date, and amount. The letter asked DuCharme to confirm that Chicago Title's records matched Ovation's records.

49.     On January 18, 2018, DuCharme checked "correct," signed the letter, and returned it to KPMG. Ex. 10. A KPMG audit team member subsequently called DuCharme and orally validated both that she had signed the confirmation and that the information received by KPMG corresponded with what she had confirmed in writing.

50.     As part of the same process the following year, on January 16, 2019, Ovation's auditors e-mailed a nearly identical 2018 audit confirmation letter to

DuCharme at her della.ducharme@ctt.com e-mail address. Ex. 12. This time, the Exhibit A included a list of 101 different escrows, by license number, commencement and funding date, and amount. *Id.* On January 17, 2019, DuCharme checked "correct," and signed the letter.



Ex. 13

51.     She then scanned it, and, by e-mail from the address della.ducharme@ctt.com—an actual e-mail domain registered to Chicago Title—e-mailed it back to KPMG. *See* Ex. 13.



52.     Ovation relied on these confirmations. As with Chicago Title's assurances

before funding, Chicago Title's audit confirmations were critical to Ovation's decision to continue funding escrows under its contract with Kim Funding. Had Chicago Title refused to respond to either audit letter, or had Ovation known that the confirmations were false, Ovation Finance would have ceased to fund new loans and exercised its rights under the Loan Agreement and Side Agreement to have its capital returned to it as expeditiously as possible. Notably, every single dollar of principal lost by Ovation Finance to the ANI scheme was wired to Chicago Title after the first audit confirmation was received on January 18, 2018, and a significant part of Ovation Finance's loss was wired after the second audit confirmation.

53.     As of August 28, 2019, $23.4 million in Ovation Finance's principal that was supposed to be safely sitting in escrow accounts protected by Chicago Title, as well as $1.4 million in interest, had not been returned.

**III.     Banc of California's Lending to the ANI Loan Program.**

54.     In mid-2017, Peterson and Kim Funding presented the ANI Loan Program opportunity to Banc of California. The ANI Loan Program seemed attractive to Banc of California because the funds were to be deposited directly into an escrow account at Chicago Title where Banc of California was to be named as a third-party beneficiary with an ownership interest in the deposited funds.

55.     In response to Banc of California's initial due diligence requests, on August 1, 2017, Peterson provided the June 23, 2017 e-mail from Elixman at the betty.elixman@chicagotitleescrows.com that had previously been provided to Ovation. As noted, the e-mail explained that "we were at 301 escrows totaling $61,370,000."

56.     In addition, Banc of California hired an outside auditor to perform a books and records audit of ANI escrows and the records of Kim Funding. The auditor, Belinda Gisbert, reviewed books and records at Kim Funding's office and confirmed to Banc of California that an e-mail from Chicago Title dated October 17, 2017 showed that the "Balance is $83,930,000 with 397 escrows."

57.     On September 28, 2017, Banc of California sent Kim Funding a

commitment letter offering a $25 million line of credit, whose purpose was to provide "Bridge financing for ABC loans." A condition of drawing on the line was:

> Verification from Chicago Title Company that the escrow is open and Chicago Title Company is requesting funding.
>
> The Chicago Title Verification needs to include: ABC License Numbers associated with loan advances and the amounts must be equal to total loan advance amount.

58.     On November 2, 2017, Banc of California and Kim Funding executed a set of "BoC Loan Documents," which included a Business Loan Agreement and a Promissory Note for a $25 million line of credit. Ex. 2. The BoC Loan Documents also included a Commercial Guaranty from ANI Development, LLC, executed by Gina Champion-Cain as Trustee of The Gina Champion-Cain Revocable Trust, dated June 26, 2012, Manager of ANI Development, LLC.  Ex. 2 at p. 37.

59.     The BoC Loan Documents provided that:

> **SPECIFIC PURPOSE.**  The specific purpose of this loan is:  to provide the capital for the financing of escrow deposits as required by California Alcoholic Beverage Control Act in connection with the sale/transfer of liquor licenses; fund shall only be advanced into .

Ex. 2 at p. 61.

60.     In addition, each advance by Banc of California on the line of credit was conditioned upon:

> b)  Verification Form from Chicago Title Company that the escrow is open and Chicago Title Company is requesting for funding. The Verification Form needs to include: ABC License Number associated with loan advance and the amount must be equal to loan advance amount.  Lender listed as having ownership of the deposit and is the Sole Beneficiary on the Escrow Agreement. The Escrow amount must equal to loan advance amount.

Ex. 2 at p. 9.

61.     A copy of the Form Escrow to be used was provided to Banc of California, and provided, in accordance with the aforementioned requirement, that Banc of California would remain the owner of the loaned principal, which would only be released to Banc of California:

Escrow No. 66061-DD

Chicago Title Company
701 B Street, Suite 760
San Diego, California 92101

ESCROW AGREEMENT
(Holding Funds)

This Escrow Agreement ("Agreement") is made and entered into as of _____, 2017, by and between ANI Development, LLC, a California limited liability company ("Lender"), and Chicago Title Company, a California corporation ("Escrow Holder").

R E C I T A L S

Lender desires to deposit certain funds and direct others to deposit certain funds (the "Deposit") into this Escrow and to provide Escrow Holder with written instructions setting forth the conditions under which Escrow Holder will invest and hold the funds and ultimately disburse them.

Lender and Escrow Holder understand that this is a limited escrow only and is being opened for the benefit of _____ ("Applicant"), who is applying for approval of a transfer to Applicant of a license issued by the California Department of Alcoholic Beverage Control ("ABC") under Business and Professions Code sections 24070-24082. The license that is the subject of Applicant's application to ABC is License No. _____ ("the License").

NOW, THEREFORE, the parties agree as follows:

A G R E E M E N T S

<u>Deposit</u>. Within five business days following the date this Agreement is signed by Lender and Escrow Holder, Lender will cause to be deposited a total sum of $_____ ("the Deposit") with Escrow Holder for the refundable deposit for Applicant's application to ABC for approval of transfer to Applicant of the License. The source of funds for the Deposit shall be from an account at Banc of California, Inc. in the name of KIM Funding, LLC. Escrow Holder will do the following:

<u>Invest Funds</u>. Place the Deposit into an interest-bearing account with all interest accruing to the account of Lender. Concurrently herewith, Lender will provide Escrow Holder with the required IRS Form W-9 and Investment Instructions required to establish such account.

<u>226 Form</u>. Escrow Holder shall send to ABC a completed Form 226 upon Escrow Holder's receipt of the Deposit.

62.     Under the Banc of California Form Escrow, Chicago Title and ANI agreed that Banc of California remained the owner of the loaned principal, which would only be released to Banc of California:

<u>Ownership of Deposit</u>. It is acknowledged and understood that only Banc of California, Inc. has an ownership interest in the Deposit and that Lender has no ownership interest in the Deposit and has no right to direct the disposition of the Deposit except as set forth in and as provided in the Release of Deposit paragraph as follows.

<u>Release of the Initial Deposit</u>. At any time, Lender may provide written instructions to Escrow Holder to release all or a portion of the Deposit and the interest thereon. During the term of this Escrow, upon the written instructions from the Lender, Escrow Holder will disburse the Deposit and, as instructed by the Lender, only to the following account:

Banc of California, Inc.

63.     On November 9, 2017, Kim Funding made its first funding request to Banc of California, for an initial $3.2 million draw on the line of credit. Kim Funding's request attached fourteen executed escrow agreements in the form specified in the Loan Agreement. Each listed an individual applicant, a license number, and was signed by Champion-Cain on behalf of ANI and by Elixman on behalf of Chicago Title.

64.     On November 27, 2017, Kim Funding requested, and Banc of California

18
COMPLAINT

funded, an additional $7.6 million available under the Loan Agreement. Each round of new funding was accompanied by copies of the form escrow agreement signed by Elixman and Champion-Cain. Ultimately, between November 9, 2017 and July 17, 2019, Banc of California Finance wired twenty-three tranches of loans to Chicago Title, purportedly to fund 207 liquor license application escrows arranged by ANI. *See* Ex. 14 (table tracking wires and escrows).

65.    As certain of the loans were purportedly repaid, Kim Funding would provide new escrows into which Banc of California would then re-loan money. The loan paydown wires that came from Chicago Title included references corresponding to the ABC license numbers that were allegedly being paid down.

66.    In April 2018, as part its internal auditing, Banc of California required its relationship managers for the Kim Funding line of credit to "touch base" with DuCharme at Chicago Title.

67.    On April 17, 2018, Banc of California relationship manager Lindy Mamer ("Mamer"), e-mailed Peterson and Champion-Cain, requesting DuCharme's e-mail address and phone number:

> Hi Kim and Gina,
>
> We have an internal audit, and they have asked if I have spoken directly to Della as an "extra" check that we are dealing with Chicago Title. Yes... I know we are because the process is working smoothly ☺ but just to answer the auditors, I would like to just touch bases with Della. Would that be okay? And if so, can you send me her email and phone number? Thank you, thank you!!
>
> Lindy
>
> **Lindy Mamer**
> Senior Vice President, Senior Relationship Manager
> Commercial Banking

Ex. 15.

68.    Five minutes later, Champion-Cain replied:

1

2

3

> **From:** Gina Champion-Cain [mailto:gina@americannationalinvestments.com]
> **Sent:** Tuesday, April 17, 2018 11:17 AM
> **To:** Lindy Mamer
> **Cc:** Kim Peterson (kimharoldpeterson@gmail.com)
> **Subject:** Re: Auditor review

4

5

> Sure!!!  Do you want email or phone? She has two email addresses they use for internal and external lines of businesses or maybe you want to just call her!  Let me know so I can give her heads up you are  calling (or emailing) to just introduce yourself and to satisfy your auditors that she actually exists.  Haha. ☺

6

*Id.*

7

     69.    Mamer responded:

8

9

> On Tue, Apr 17, 2018 at 11:36 AM, Lindy Mamer <Lindy.Mamer@bancofcal.com> wrote:
> I think both. I should talk to her to verify her voice (if I ever need to call her in the future) and an email so I can have it in writing for the file.

10

11

12

> **Lindy Mamer**
> Senior Vice President, Senior Relationship Manager
> Commercial Banking

13

*Id.*

14

     70.    Eighteen minutes later, Champion-Cain, having purportedly checked with

15

DuCharme, responded:

16

17

> **From:** Gina Champion-Cain [mailto:gina@americannationalinvestments.com]
> **Sent:** Tuesday, April 17, 2018 11:54 AM
> **To:** Lindy Mamer
> **Subject:** Re: Auditor review

18

19

20

> She is in and out of the office a lot today and tomorrow.  She said she will be available at her office phone anytime between 9:30am - 11am **tomorrow** (Wednesday) for a quick introduction call.  (619) 230-6363 direct.  Do you want to give me a time you want to buzz her quickly so I can let her know to make sure she doesn't step out of the office unexpectedly?  She is really a busy lady!!

21

*Id.*

22

     71.    After Mamer indicated that "9:30 would be fabulous" and that Mamer and

23

Adrienne Helvie, another Banc of California employee, would "call [DuCharme]

24

directly," Champion-Cain responded again:

25

26

27

28

1
2
3
4
5
6
7

> From: Gina Champion-Cain <gina@americannationalinvestments.com>
> To: Lindy Mamer <Lindy.Mamer@bancofcal.com>
> Subject: Re: Auditor review
> Date: Tue, 17 Apr 2018 12:18:50 -0700
> Importance: Normal
> Inline-Images: image001.jpg
>
> _____
>
> Ok great, I will let her know.  By the way, I did confirm with her that this is just a quick intro call so you can introduce yourself.  As you recall from your early dealings with Kim when you were setting up this line of credit, if you have any questions regarding the program, you need to go directly through me.  There is a strict protocol for this program due to the fact we have many different lenders and, thus, Chicago Title's Master Escrow Holding Agreement is with ANI Development, LLC.  There are confidentiality and fiduciary issues at stake, and Chicago Title seemingly acting for multiple parties can face difficult challenges even when these parties are of a single, non-conflicting class.  If you have specific requests, always put those in writing to me, and I, in turn, will forward to Della/Betty at Chicago Title for them to answer.  I need everything in a paper trail for this program as you can imagine.  All the other lenders (including banks like yours) follow this protocol.  Again, we are very lucky Della works with us on this deal.  I never want that to change.  Thanks, Lindy!

8    *Id.*

9    72.    The call between Mamer, Helvie, and DuCharme took place as scheduled.

10   Banc of California's "Kim Funding File" included contemporaneous notes from the

11   call.

**Call Report for Kim Funding File**

4-18-18

**PHONE DISCUSSION WITH DELLA DUCHARME**

Phone number matched with one for Chicago Title on google website

Lindy Mamer and Adrienne Helvie spoke with Della Ducharme at Chicago Title today, to reaffirm that the escrow process was going well, and made sure that she had our names and contact numbers incase she ever needed them.

She said that their department had it down very smoothly after all these years. Betty Elixman is her Assistant and Della signs off on all the escrows established/released.

She has been working for Chicago Title for over 20 years (Lindy Mamer has worked with her for title insurance with CNB and Union Bank). Della is located in the downtown San Diego Chicago Title office in the "Darth Vader" Building.

Della was trained by Kathy Robinson, a well know Chicago Title Officer who was known throughout San Diego, before she retired and passed away.

Ex. 16

73.    In summer 2018, Kim Funding sought an increase on its line of credit with the Banc of California loan. As part of the contemplated increase, Banc of California required expanded due diligence of Chicago Title. As Banc of California relationship manager Steve Cusato explained in an e-mail to Peterson:

> I have assembled a team within the Banc to expand our due diligence of Chicago Title. Of course their financial statements and that of their parent are available publically and I have made sure they have been available internally.
>
> I think where we are going more towards a kick the tires and understand their internal control procedures. I think if we understood their process flow (high level) from start to finish that would work. Specifically the controls that are in place for the movement of money back and forth between you and Chicago. In addition the segregation between your escrow and the sister escrow.
>
> The team in addition to myself will be a senior credit officer that specifically works with financial institutions, internal legal and a senior operations process officer.
>
> My feeling is that it would not take but a couple of hours. I would like the final internal report to say; " Chicago is very professional with good controls and safeguards, experienced professionals and all levels; they have the balance sheet to back up their operations and a parent company that provides additional back up. We are comfortable that the collateral funds we have at their institution are safe and sound and we consider the risk minimal and acceptable for the commitment we are considering.

Ex. 17.

74.    On September 19, 2018, relationship managers Mamer and Steve Cusato ("Cusato") visited DuCharme and Elixman at Chicago Title's office and met DuCharme and Elixman in person. A contemporaneous e-mail drafted by Mamer states:

> Steve and I just dropped in to Chicago Title Commercial and Industrial Escrow Dept and saw Betty Elixman and Della DuCharme in person. They confirmed our $25mm as of yesterday. We discussed the reporting and their compliance by the State which sounds almost as extensive as our bank regulations.

Ex. 18.

75.    Following the visit, Cusato also confirmed the visit with DuCharme and Elixman, by e-mail to their @ctt.com e-mail addresses:

> **From:** Steve Cusato <Stephen.Cusato@bancofcal.com>
> **Sent:** Wednesday, September 19, 2018 12:40 PM
>
> #25
>
> ──────────────────────────────────
>
> **To:** DuCharme, Della <Della.DuCharme@ctt.com>
> **Cc:** Elixman, Betty <Betty.Elixman@ctt.com>; Lindy Mamer <Lindy.Mamer@bancofcal.com>
> **Subject:** Thank you for all your hard work
>
> IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
> Sorry we did not get to say "hi" when we stopped by earlier with the flowers and cookies. We hope you enjoy them
>
> Lindy and I realize that we have been a bit needy with our report request and wanted to say thank you. Our external auditors are driving us all crazy. Your verification should put them at bay (same one you do for Cal Private).
>
> I know I speak for the whole Banc in saying your professionalism is impressive and exemplary and a critical component our involvement in the overall relationship.
>
> Thank you again for helping us and all you do.
>
> Steve
>
> **Steve Cusato**
> SVP Market Executive
> Commercial Banking

Ex. 19.

76.    DuCharme responded, copying Elixman, again from @ctt.com e-mail

addresses:

From: "DuCharme, Della" <Della.DuCharme@ctt.com>
To: Steve Cusato <Stephen.Cusato@bancofcal.com>
Cc: "Elixman, Betty" <Betty.Elixman@ctt.com>, Lindy Mamer
    <Lindy.Mamer@bancofcal.com>
Subject: RE: Thank you for all your hard work
Date: Wed, 19 Sep 2018 19:47:29 +0000
Importance: Normal
Inline-Images: image001.png; image002.png; image003.png

I apologize I was on a lengthy conference call, please let me know when you are going to stop by I am happy to make some time. We really appreciate the beautiful flowers and delicious cookies can never have too many of those. Many thanks, have a great day!

DD
**Della DuCharme**
Chicago Title Company
C&I Escrow Officer
701 B Street, **SUITE 1120**
San Diego, CA 92101
(619) 230-6363 direct
(619) 230-6368 fax
619-839-3866 Efax
Della.ducharme@ctt.com

*Id.*

77. Banc of California's direct confirmation with Chicago Title, including on the telephone (using a verified phone number), an in-person visit, and direct e-mail played a crucial role in Banc of California's comfort and decision to continue funding escrows under the loan and further to increase the line by $10 million (to $35 million) in February 2019. At any point when it sought direct communication from Chicago Title, if Chicago Title had not provided confirmation of Banc of California's funds, Banc of California would not have agreed to wire funds into any accounts controlled by Chicago Title, nor would it have increased Kim Funding's line by $10 million in February 2019.

78. As of August 28, 2019, Banc of California lost approximately $35 million in principal it believed was safely sitting in escrow accounts protected by Chicago Title.

## IV. The True Nature of the ANI Scheme.

79. Unfortunately for ANI's lenders, the entire ANI Loan Program was a fraudulent scheme.

80. There were no liquor license applicants applying for loans from ANI.

81. Although the ABC Lawyer was the name of an actual lawyer who does

23

ABC work, that lawyer was not sending his clients to ANI. The written communications from him answering specific questions regarding his facilitation of the loans to his clients were apparently fabricated and sent from an e-mail address that was created by someone else, likely affiliated with Champion-Cain.

82.     There were no safe individual escrow accounts under the Form Escrow where the lenders were third-party beneficiaries.

83.     "@chicagotitleescrows.com" is not a real Chicago Title e-mail domain.

84.     Many of the executed Form Escrow agreements provided to the lenders were forgeries. Champion-Cain, however, has admitted to federal law enforcement authorities, and will testify, that Chicago Title knew that Champion-Cain was signing Form Escrows in the names of Chicago Title escrow agents. Other Form Escrows may have been physically signed by DuCharme or Elixman, but Chicago Title never treated them as effective over the funds deposited by Plaintiffs. Despite the statements of Chicago Title to the contrary, the lenders' funds were not deposited into accounts in the names of lenders that were earmarked for individual liquor license applicants.

85.     Instead, the lenders were all unknowingly wiring their money into a single account at Chicago Title that Chicago Title treated as governed by an entirely different contract (the "Concealed Non-Escrow") over which Champion-Cain had unfettered discretion to withdraw funds for any reason for a fee, payable to Chicago Title, of $500 per transaction. *See* Ex. 7. Indeed, the Concealed Non-Escrow was facially unlawful under the California Escrow Law, because it was not an "escrow" at all. A licensed escrow company like Chicago Title may not describe an account as an escrow, unless it meets the statutory definition of that term. Cal. Fin. Code § 17403.1.

86.     Under the Escrow Law, an "escrow" is a "transaction in which one person, for the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by that third person until the happening of a specified event or the performance of a

prescribed condition, when it is then to be delivered by that third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter." Cal. Fin. Code 17003(a).

87.     Although the Form Escrows satisfy that definition, the Concealed Non-Escrow does not. The Concealed Non-Escrow was not made for "the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person"—it was essentially just a depository account. Nor did it condition release on "the happening of a specified event or the performance of a prescribed condition"—Champion-Cain could, and did, withdraw funds at will for any reason. And it did not entail delivery by Chicago Title to "a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter"—the funds were simply returned to Champion-Cain, the only beneficiary of the Concealed Non-Escrow contract, which notably makes no mention that third parties would be wiring hundreds of millions of dollars through the account.[3]

88.     Despite the unlawfulness of the arrangement, Chicago Title facilitated ANI's scheme by permitting Champion-Cain to take the lenders' funds out of accounts represented to Plaintiffs to be escrow accounts as if the accounts were simply Champion-Cain's checking account.

89.     And withdraw Champion-Cain did. Hundreds of millions of lenders' dollars flowed through Champion-Cain's Concealed Non-Escrow account. Champion-Cain skimmed off tens of millions of dollars to fund various real estate, restaurant, and hospitality ventures by American National Investments, her investment company and ANI's parent.

90.     When federal law enforcement authorities seized the scheme and placed ANI into receivership on August 28, 2019, only $11 million remained in the Chicago

---

[3] The account number on the Concealed Non-Escrow appears to have changed annually. In 2017, it was 66061-DD. In 2018, it was 93790-DD. In 2019, it was 102112-DD.

1    Title escrow account.

2       91.    In truth, the ANI Loan Program was an elaborate fraud:



14      92.    Although the full magnitude of the fraud is currently unknown, based on

available information, it has been estimated that the ANI fraud resulted in at least $400

million cycling through the Concealed Non-Escrow account, resulting in $140 million

in lost principal by 50 or more lenders.

**V.    Chicago Title Was Complicit in the ANI Scheme.**

    **A.    Through Its Agents, Chicago Title Knew of, and Participated in, the Scheme.**

    93.    Elixman and DuCharme were in on the scheme. While acting in their

capacities as escrow agents at Chicago Title, they were simultaneously working as part

of the ANI criminal conspiracy with Champion-Cain.

    94.    Both knew all along that, although Champion-Cain was soliciting loans for

liquor license escrow accounts under the Form Escrow, those loans were, in fact, being

deposited in an account governed by the Concealed Non-Escrow, under which

Champion-Cain had full discretionary control. DuCharme and Elixman knew that

Champion-Cain was engaged in a massive fraud.

95.     Elixman and DuCharme also knew that Champion-Cain was imitating them using the @chicagotitleescrows.com e-mail addresses. Despite knowing that Champion-Cain was using fake e-mail accounts designed to look like they were e-mails sent from Elixman's and DuCharme's legitimate Chicago Title e-mail accounts, neither Elixman nor DuCharme did anything to stop this deceitful conduct. Indeed, they were willing participants who benefitted substantially from the scheme, by accepting payoffs and bonus compensation for their efforts.

96.     The scheme almost fell apart in early 2017. Kim Funding was attempting to get additional funding from a local San Diego bank. Executed Form Escrows for those loans identified a "Wendy Reynolds" as the Chicago Title escrow officer. But the signature had been forged by Champion-Cain. When the bank called Chicago Title to verify Wendy Reynolds' signatures, the bank was told that nobody named Wendy Reynolds worked at Chicago Title.

97.     The bank informed Peterson of this fact. Peterson, in turn, asked Champion-Cain for an explanation. Champion-Cain said that Wendy Reynolds was a former Chicago Title employee, and that to aid things along, she could obtain substitute Form Escrows signed by a current Chicago Title escrow officer.

98.     After Champion-Cain's story was relayed to the bank, the bank told Peterson that it would consider loaning him money based on newly signed documentation, but it would need an officer of Chicago Title to sign an incumbency certificate certifying that the escrow officer had full authority to sign the Form Escrows on behalf of Chicago Title.[4]

---

[4] "An incumbency certificate (or certificate of incumbency) is an official document issued by a corporation or limited liability company (LLC) that lists the names of its current directors, officers, and, occasionally, key shareholders. It specifies who holds which positions within the organization, and is most frequently used to confirm the identity of individuals who are authorized to enter into legally binding transactions on the company's behalf." Investopedia, *Incumbency Certificate* (May 3, 2019) *https://www.investopedia.com/terms/i/incumbencycertificate.asp.*

99.   On or around February 1, 2017, Champion-Cain went to the San Diego Offices of Chicago Title to obtain fresh signatures on the Form Escrows.

100.   There, DuCharme and an officer of Chicago Title executed an Incumbency Certificate and Authorization from Chicago Title. *See* Ex. 6.

101.   The Incumbency Certificate certified that DuCharme was "authorized to execute Escrow Agreements for the purpose of requesting draws from [the bank] pursuant to" a credit agreement between Kim Funding and the bank, and that DuCharme was "duly elected, qualified, and acting as members, managers and(or) [sic] officers, as indicated, of [Chicago Title] and hold on the date hereof the offices or titles set forth opposite their respective names, and [that] the signatures set opposite each of their respective names are their genuine signatures[.]"

102.   The Incumbency certificate was signed by DuCharme:

| Name | Title | Signature |
| --- | --- | --- |
| Della DuCharme | C&I Escrow Officer | By: |

103.   The Incumbency Certificate was also witnessed by Thomas Schwiebert, the Vice President of Commercial and Industrial Sales at Chicago Title:

Chicago Title Company,
a California corporation

By:
Name: _Thomas M. Schwiebert_
Title: _VP Chicago Title_

104.   Simultaneous with executing the Incumbency Certificate, and in the presence of Schwiebert, DuCharme then re-signed twenty-four phony Form Escrow agreements in her own hand. *See* Ex. 8. Thereafter, the bank declined to provide funding to Kim Funding; and, Peterson began searching for other funding sources—including from Ovation and Banc of California. Accordingly, when Ovation and Banc of California subsequently wired funds to Chicago Title in connection with ANI,

Chicago Title was aware those were provided in connection with Champion-Cain's fraud.

105.  On several occasions, lenders, like Plaintiffs here, had direct contact with Chicago Title, through DuCharme and Elixman.

106.  For example, as previously described, *supra* ¶ 45, Ovation spoke with DuCharme prior to Ovation Finance ever funding any loans, and DuCharme confirmed (falsely) that Ovation Finance was wiring into a specific escrow account that was governed by an escrow agreement for which Ovation Finance was the beneficiary. And DuCharme twice signed correspondence, and verbally confirmed on one occasion, to Ovation's independent auditors falsely verifying that money tied to specific license escrows sat in Chicago Title escrow accounts. *Supra* ¶¶ 49–51.

107.  Similarly, as previously described, supra ¶¶ 66–72, prior to the $10 million loan increase, Banc of California spoke with DuCharme via telephone and DuCharme confirmed (falsely) the structure and process of the ABC escrows. In addition, the Banc of California relationship managers visited DuCharme and Elixman at Chicago Title's office and received confirmation that Chicago Title was holding Banc of California's funds and discussed the ABC liquor license escrows. That visit was confirmed by an e-mail from DuCharme later that day.

108.  Plaintiffs allege on information and belief that DuCharme and Elixman had additional direct encounters with ANI's other lenders, including signing confirmation letters sent by other lenders' auditors.

109.  DuCharme and Elixman's misconduct was integral to their roles as escrow officers for Chicago Title—setting up escrows and ensuring that the parties who deposited money into them could have confidence that it was handled according to their instructions. Their misconduct involved misuse of Chicago Title's core product and undermined the essential purpose of placing funds in escrow—to ensure the safety of the escrowed funds.

110.  DuCharme and Elixman conducted their nefarious activities out of Chicago

Title's offices, using Chicago Title's bank accounts, telephones, computers, form escrow agreements and other documents, and, on some occasions, its e-mail system.

111.   DuCharme and Elixman's fraudulent actions were thus reasonably related to the kinds of tasks that a Chicago Title officer would be employed to perform. They were also reasonably foreseeable in light of Chicago Title's business and DuCharme and Elixman's job responsibilities. That a Chicago Title escrow officer might participate in fraud using fraudulent escrow agreements and related documentation was a generally foreseeable risk inherent and incidental to Chicago Title's escrow business.

112.   There is direct evidence in the form of the Incumbency Certificate that DuCharme and Elixman's superior Schweibert—an officer of Chicago Title—was aware of what was transpiring. And, as discussed above, given the circumstances, breadth, brazenness, and length of the fraud, there is also substantial circumstantial evidence that higher management at Chicago Title would have been aware of the misconduct, had Chicago Title employed even the flimsiest of internal controls.

113.   Through DuCharme and Elixman, as well as through Schweibert, Chicago Title was aware that ANI's lenders believed that the money they funded through escrows held at Chicago Title would be used only for specific liquor license escrows under escrow agreements that did not permit ANI to unilaterally withdraw it.

114.   And through DuCharme and Elixman, and likely others, Chicago Title was aware that ANI's lenders' money was not, in fact, being used for those purposes.

115.   Chicago Title did not disclose those facts to Plaintiffs.

116.   Under the circumstances, DuCharme and Elixman's misconduct in performing their core functions as Chicago Title escrow officers was not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Chicago Title's business. Thus, Chicago Title should be held to account for their acts.

117.   Moreover, as an institution, Chicago Title was, reckless, if not willfully blind, in preventing its employees from using the instrumentalities of its business to

1   facilitate and engage in brazen acts of fraud.

2       118.   As a "licensed sender of money or any other person who engages as a

3   business in the transmission of funds," Chicago Title is a "financial institution," subject

4   to the Bank Secrecy Act. 31 U.S.C. § 5312(a)(2)(R). The PATRIOT Act requires every

5   financial institution covered by the Bank Secrecy Act to establish an anti-money

6   laundering program. 31 U.S.C. § 5318(h). In particular, under the PATRIOT Act, "each

7   financial institution shall establish anti-money laundering programs, including, at a

8   minimum—(A) the development of internal policies, procedures, and controls; (B) the

9   designation of a compliance officer; (C) an ongoing employee training program; and

10   (D) an independent audit function to test programs." Treasury regulations enacted under

11   the PATRIOT Act further require non-bank financial institutions to employ "know your

12   customer" practices and to keep accurate records of financial transactions, including

13   records regarding the verification of the identity of those transmitting funds. 31 C.F.R.

14   §§ 1010.220; 1010.410(e). Moreover, the California Escrow Law, Cal. Fin. Code

15   § 17000, *et seq.*, further regulates the conduct of escrow agents and imposes detailed

16   recordkeeping and auditing requirements of its own. Cal. Fin. Code §§ 17404, 17406,

17   17406.1.

18       119.   Despite all of this regulatory scrutiny—scrutiny whose purpose is to give

19   confidence to the public—Chicago Title permitted the scheme to go on for years, using

20   internal systems that should have been subject to review and audit by Chicago Title

21   employees and consultants. The ongoing fraud created a permanent record of escrow

22   agreements, wire transfers, and electronic communications that could have been easily

23   detected and stopped if Chicago Title followed the basic anti-money-laundering and

24   "know your customer" procedures that any reasonable financial institution would

25   follow. Even if the higher-ups in the San Diego Office of Chicago Title could have been

26   unaware of the Form Escrows—and Schweibert's signature on the Incumbency

27   Certificate demonstrates otherwise—over the life of the scheme hundreds of millions of

28   dollars were being wired into and out of the Concealed Non-Escrow account (*See* Ex.

7)—an unlawful one-party false escrow account with no apparent commercial purpose.

120.   The most rudimentary of an internal audit should have caught that as suspicious. Red flags were flying.

### B.   Chicago Title, Elixman, and DuCharme All Profited from the ANI Scheme.

121.   Chicago Title made money from the scheme. Over the life of the scheme, hundreds of millions of dollars were wired into and out of Champion-Cain's Concealed Non-Escrow account. Chicago Title was paid either $1,000 per non-existent Form Escrow (as represented by ANI) or $500 per withdrawal by Champion-Cain (under the terms of the Concealed Non-Escrow). Plaintiffs allege, on information and belief based on pleadings and filings in other actions and discussions with Peterson and his counsel and counsel for Champion-Cain, that there were thousands of such transactions, and that Chicago Title received more than $1,000,000 in compensation for its participation in this criminal enterprise. Chicago Title also benefitted from Champion-Cain's misappropriation of the lenders' principal by selling her escrow, title insurance, and other services in connection with the unauthorized business ventures, earning ample fees and commissions at each step. In addition, Champion-Cain directed tens of millions of dollars of lender funds into other Chicago Title escrows for her investments, generating additional compensation and fees for Chicago Title. All of this activity increased profitability and likely led to compensation and bonus increases for the escrow officers and various Chicago Title executives.

122.   DuCharme and Elixman personally profited directly from the ANI criminal enterprise, too. During the early years of the scheme, Champion-Cain paid DuCharme and Elixman thousands of dollars in cash bribes each year.

123.   Champion-Cain also wined and dined DuCharme and Elixman at restaurants owned by Champion-Cain, providing them, along with their family and friends, with free food and drink.

124.   After the February 2017 bank incident described in paragraphs 99-104

1  above, Champion-Cain increased her bribes to DuCharme and Elixman as

2  compensation for their participation in the scheme. *See* Ex. 9 (financial records

3  provided by Champion-Cain's counsel to Plaintiffs).

4      125.   On January 20, 2018, Champion-Cain wrote a $13,000 check from her

5  personal checking account to DuCharme, with the memo stating "Gift !" DuCharme

6  cashed that check six days later.

 

13     126.   That same day, Champion-Cain cut a $5,000 check to Elixman from the

14  same account. The memo said "Gift ☺." Elixman cashed her check five days later.



21     127.   On December 16, 2018, Champion-Cain wrote a $10,000 check to

22  DuCharme from the same account, the memo again stating "Gift." DuCharme cashed

23  her check two weeks later.

1

2

3

4

5

6

7

8

9



10    128.   That same day, Champion-Cain wrote a $1,000 check to Elixman from the

11  same account, again writing "gift" in the memo. Elixman cashed the check eight days

12  later.

13

14

15

16

17

18



19

20

21

22

23



24  **VI.    Plaintiffs' Injuries.**

25    129.   By reason of Chicago Title's unlawful actions, Plaintiffs have been

26  defrauded out of the principal and interest on their loans and injured in their businesses

27  and property.

28

130.   Ovation Finance lost roughly $23.4 million in loan principal in funds it had wired to Chicago Title. Ovation Finance also lost any interest accrued on those funds.

131.   Banc of California lost roughly $35 million in loan principal in funds it wired to Chicago Title. Banc of California also lost any interest accrued on those funds.

132.   The announcement of the collapse of the criminal enterprise caused consequential damages to both Ovation and Banc of California beyond the loan losses described in paragraphs 129 and 130, the exact amount of which will be proved at trial.

## CAUSES OF ACTION

### First Cause of Action

**Violation of the Racketeer Influenced and Corrupt Organizations Act**
18 U.S.C. § 1962(c)
Against All Defendants

133.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

134.   This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

135.   At all relevant times, Chicago Title was a "person" within the meaning of 18 U.S.C. § 1961(3), as it was "capable of holding a legal or beneficial interest in property."

136.   As a limited liability company created for the sole purpose of operating Champion-Cain's scheme, ANI operated as an "enterprise."

137.   Chicago Title—through its agents DuCharme, Elixman, and others yet unknown—conducted and participated in the affairs of the ANI scheme through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), consisting of numerous and repeated instances of wire fraud, bank fraud, money laundering, and

bribery in violation of 18 U.S.C. § 1962(c).

138.   Chicago Title benefitted from the acts of DuCharme, Elixman, and its other unnamed agents. It was paid $1,000 for each fictional "escrow" that DuCharme and Elixman accepted funds for and falsely purported to set up and/or $500 for each withdrawal or disbursement to ANI, Champion-Cain, or affiliated entities.

139.   ANI was created and/or used as a tool to carry out the elements of Champion-Cain and Chicago Title's illegal scheme and pattern of racketeering activity. ANI had an ascertainable structure beyond the scope and commission of the predicate acts and conspiracy to commit such acts. ANI is further a corporate entity separate and distinct from defendants.

140.   Champion-Cain and Chicago Title—through their agents and their co-conspirators—conducted the affairs of ANI and all had the common purpose to secure benefits and profit by obtaining access to capital and placing it to their own uses through wire fraud, bank fraud, money laundering, and commercial bribery.

141.   ANI engaged in, and its activities affected, interstate and foreign commerce by, among other things, unlawfully borrowing money in interstate transactions and investing it in other businesses that engaged in interstate commerce.

142.   Chicago Title participated in the operation and managed the affairs of the enterprise as described herein.

143.   Chicago Title committed or aided and abetted the commission of at least 78 discrete predicate acts of racketeering activity. The multiple acts of racketeering activity that Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, extended for several years, had fifty or more victims, and, had the government not placed ANI into a receivership, posed a threat of further continuing criminal activity, and therefore constitute a "pattern of racketeering activity."

144.   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

**a.** **Racketeering Act 1:** During, at minimum, 2015 and 2016, DuCharme and Elixman accepted cash gifts in excess of $250 from Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use their positions as Chicago Title escrow officers for the benefit of ANI's ongoing scheme, acts of bribery in violation of California Penal Code § 641.3.

**b.** **Racketeering Act 2:** From at least 2015 and continuing to August 28, 2019, DuCharme and Elixman accepted lavish complimentary dining experiences and other entertainment valued in excess of $250 from Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use their positions as Chicago Title escrow officers for the benefit of Champion-Cain and the ANI scheme, acts of bribery in violation of California Penal Code § 641.3.

**c.** **Racketeering Act 3:** On or about July 20, 2017 Ovation Finance wired $10,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**d.** **Racketeering Act 4:** On or about August 30, 2017, Ovation Finance wired $5,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by

ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

e.      **Racketeering Act 5:** On or about October 5, 2017, Ovation Finance wired $5,025,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

f.      **Racketeering Act 6:** On or about December 1, 2017 Ovation Finance wired $5,100,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a

fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

      **g.**    **Racketeering Act 7:** On or about November 9, 2017, Banc of California wired $3,200,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

      **h.**    **Racketeering Act 8:** On or about November 28, 2017, Banc of California wired $7,600,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

      **i.**    **Racketeering Act 9:** On or about December 1, 2017, Banc of California wired $175,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of

California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

j.     **Racketeering Act 10:** On or about December 22, 2017, Ovation Finance wired $200,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

k.     **Racketeering Act 11:** On or about January 9, 2018, Banc of California wired $5,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's

money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**l.      Racketeering Act 12:** On or about January 18, 2018, DuCharme, in her capacity as a Chicago Title escrow officer signed a written audit confirmation that falsely confirmed that Chicago Title held in escrow $25 million in the name of Ovation Finance, in connection with escrow accounts for specific liquor license escrows and transmitted that document to Ovation over the wires or in the mails, in violation of 18 U.S.C. §§ 2, 1341, and 1343.

**m.      Racketeering Act 13:** On or about January 20, 2018, DuCharme accepted a $13,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

**n.      Racketeering Act 14:** On or about January 20, 2018, Elixman accepted a $5,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

**o.      Racketeering Act 15:** On or about January 25, 2018, Banc of California wired $150,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully

aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

p.      **Racketeering Act 16:** On or about February 13, 2018, Banc of California wired $5,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

q.      **Racketeering Act 17:** On or about February 21, 2018, Ovation Finance wired $1,200,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a

fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

r.     **Racketeering Act 18:** On or about March 1, 2018, Ovation Finance wired $1,400,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

s.     **Racketeering Act 19:** On or about March 14, 2018, Ovation Finance wired $1,300,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

t.     **Racketeering Act 20:** On or about March 15, 2018, Chicago Title wired $156,250 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow

account subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

u.    **Racketeering Act 21:** On or about April 4, 2018, Banc of California wired $250,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

v.    **Racketeering Act 22:** On or about March 22, 2018, Chicago Title wired $156,250 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

w.    **Racketeering Act 23:** On or about April 3, 2018, Ovation Finance wired $1,800,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation

Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

x.    **Racketeering Act 24**: On or about April 9, 2018, Chicago Title wired $155,301.36 from an account controlled by Chicago Title to Ovation. The beneficiary instructions provided with the wire reference three liquor license application numbers that appeared in Form Escrows previously provided to Ovation, suggesting that the funds were tied to specific escrow accounts subject to a Form Escrow. In fact, no such accounts existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, and 1343.

y.    **Racketeering Act 25:** On or about April 12, 2018, Ovation Finance wired $150,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

z. **Racketeering Act 26:** On or about April 18, 2018 DuCharme, in her capacity as a Chicago Title escrow officer, confirmed by telephone call with Banc of California, a financial institution, that the $25 million Banc of California loaned Kim Funding for use in the ANI Loan Program were placed in "escrows" that she personally "signed off on," in violation of 18 U.S.C. §§ 2, 1341, 1343 and 1344.

aa. **Racketeering Act 27:** On or about April 26, 2018, Chicago Title wired $290,000 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

bb. **Racketeering Act 28:** On or about May 2, 2018, Chicago Title wired $687,500 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow account subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

cc. **Racketeering Act 29:** On or about May 3, 2018, Banc of California wired $250,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by

ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**dd.     Racketeering Act 30:** On or about May 10, 2018, Banc of California wired $5,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**ee.     Racketeering Act 31:** On or about May 10, 2018, Banc of California wired $550,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's

money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

ff.      **Racketeering Act 32:** On or about May 21, 2018, Chicago Title wired $187,500 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

gg.      **Racketeering Act 33:** On or about May 30, 2018, Chicago Title wired $206,500 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

hh.      **Racketeering Act 34:** On or about June 4, 2018, Banc of California wired $150,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully

aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

  **ii.**  **Racketeering Act 35:** On or about June 4, 2018, Banc of California wired $175,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

  **jj.**  **Racketeering Act 36:** On or about June 13, 2018, Ovation Finance wired $2,150,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a

fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

kk.     **Racketeering Act 37:** On or about June 22, 2018, Chicago Title wired $786,250 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

ll.     **Racketeering Act 38:** On or about June 26, 2018, Banc of California wired $650,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

mm.    **Racketeering Act 39:** On or about August 2, 2018, Ovation Finance wired $900,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully

aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**nn.    Racketeering Act 40:** On or about August 2, 2018, Banc of California wired $150,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**oo.    Racketeering Act 41:** On or about September 5, 2018 Ovation Finance wired $1,025,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**pp.** **Racketeering Act 42:** Also on or about September 5, 2018, Ovation Finance wired $200,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**qq.** **Racketeering Act 43:** On or about September 14, 2018, Chicago Title wired $450,000 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

**rr.** **Racketeering Act 44:** On or about September 18, 2018, Banc of California wired $375,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's

money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

ss.     **Racketeering Act 45:** On or about October 3, 2018, Ovation Finance wired $475,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

tt.     **Racketeering Act 46:** On or about October 11, 2018, Ovation Finance wired $2,450,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

uu.     **Racketeering Act 47:** On or about October 30, 2018 Ovation Finance wired $1,300,000 to an account controlled by Chicago Title, with the

understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**vv.** **Racketeering Act 48:** On or about October 31, 2018, Ovation Finance wired $2,725,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**ww.** **Racketeering Act 49:** On or about November 1, 2018, Chicago Title wired $1,250,000 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow account subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in

violation of 8 U.S.C. §§ 2, 1343, and 1344.

xx.     **Racketeering Act 50:** On or about November 6, 2018, Banc of California wired $1,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

yy.     **Racketeering Act 51:** On or about November 16, 2018, Ovation Finance wired $150,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

zz.     **Racketeering Act 52:** On or about December 4, 2018, Banc of California wired $850,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by

ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

     **aaa.** **Racketeering Act 53:** On or about December 16, 2018, DuCharme accepted a $10,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

     **bbb.** **Racketeering Act 54:** On or about December 16, 2018, Elixman accepted a $1,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

     **ccc.** **Racketeering Act 55:** On or about January 15, 2019, DuCharme, in her capacity as a Chicago Title escrow officer, signed a written audit confirmation that falsely confirmed that Chicago Title held in escrow $25 million in the name of Ovation Finance, in connection with escrow accounts for specific liquor license escrows and transmitted that document to Ovation by e-mail and/or mail, in violation of 18 U.S.C. §§ 2, 1341, and 1343.

     **ddd.** **Racketeering Act 56:** On or about January 31, 2019 Ovation Finance wired $350,000 to an account controlled by Chicago Title, with the

understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**eee.    Racketeering Act 57:** On or about February 8, 2019, Chicago Title wired $267,000 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow account subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

**fff.    Racketeering Act 58:** On or about February 11, 2019, Ovation Finance wired $500,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a

fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

ggg.   **Racketeering Act 59:** On or about February 11, 2019, Banc of California wired $225,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

hhh.   **Racketeering Act 60:** On or about March 4, 2019, Ovation Finance wired $3,475,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

iii.   **Racketeering Act 61:** On or about March 4, 2019, Banc of California wired $10,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by

ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**jjj.**   **Racketeering Act 62:** On or about March 19, 2019, Chicago Title wired $1,092,301.34 from an account controlled by Chicago Title to Ovation. The beneficiary instructions provided with the wire reference five liquor license application numbers that appeared in Form Escrows previously provided to Ovation, suggesting that the funds were tied to specific escrow accounts subject to a Form Escrow. In fact, no such accounts existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, and 1343.

**kkk.**   **Racketeering Act 63:** On or about March 22, 2019, Ovation Finance wired $1,000,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**lll.     Racketeering Act 64**: On or about April 2, 2019, Chicago Title wired $1,218,750 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

**mmm.     Racketeering Act 65:** On or about April 3, 2019, Banc of California wired $975,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**nnn.   Racketeering Act 66:** On or about April 15, 2019, Ovation Finance wired $775,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without

disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

ooo.   **Racketeering Act 67:** On or about April 23, 2019, Ovation Finance wired $575,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

ppp.   **Racketeering Act 68:** On or about May 8, 2019, Ovation Finance wired $175,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

qqq.   **Racketeering Act 69:** On or about May 14, 2019, Chicago Title wired $3,093,750 from an account controlled by Chicago Title to Banc of

California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

rrr.    **Racketeering Act 70:** On or about May 16, 2019, Banc of California wired $2,475,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

sss.    **Racketeering Act 71:** On or about May 30, 2019, Ovation Finance wired $1,525,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which

Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**ttt.    Racketeering Act 72:** On or about June 11, 2019, Ovation Finance wired $1,875,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**uuu.   Racketeering Act 73:** On or about June 18, 2019, Chicago Title wired $4,218,750 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow account subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

**vvv.   Racketeering Act 74:** On or about June 24, 2019, Banc of California wired $3,375,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully

aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**www.  Racketeering Act 75:** On or about July 1, 2019, Ovation Finance wired $800,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**xxx.   Racketeering Act 76:** On or about July 15, 2019, Chicago Title wired $2,233,875 from an account controlled by Chicago Title to Banc of California. The beneficiary instructions provided with the wire reference a liquor license application number that appeared in a Form Escrow previously provided to Banc of California, suggesting that the funds were tied to a specific escrow accounts subject to a Form Escrow. In fact, no such account existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, 1343, and 1344.

**yyy.   Racketeering Act 77:** On or about July 16, 2019, Chicago Title wired $1,020,924.65 from an account controlled by Chicago Title to Ovation.

The beneficiary instructions provided with the wire reference three liquor license application numbers that appeared in Form Escrows previously provided to Ovation, suggesting that the funds were tied to specific escrow accounts subject to a Form Escrow. In fact, no such accounts existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2 and 1343.

zzz.   **Racketeering Act 78:** On or about July 18, 2019, Ovation Finance wired $950,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

aaaa. **Racketeering Act 79:** On or about July 19, 2019, Banc of California wired $1,725,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Banc of California's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Banc of California. Chicago Title was fully aware of and had confirmed Banc of California's expectations. Yet, without disclosing it to Banc of California, Chicago Title caused Banc of California's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at

will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2, 1343, and 1344.

**bbbb. Racketeering Act 80:** On or about August 8, 2019, Ovation Finance wired $500,000 to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account in Ovation Finance's name to fund specific liquor license application escrows arranged by ANI, and under escrow conditions mandating that the funds could not be distributed to any person other than Ovation Finance. Chicago Title was fully aware of and had confirmed Ovation Finance's expectations. Yet, without disclosing it to Ovation, Chicago Title caused Ovation Finance's money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

**cccc. Racketeering Act 81**: On or about August 16, 2019, Chicago Title wired $1,835,252.71 from an account controlled by Chicago Title to Ovation. The beneficiary instructions provided with the wire reference five liquor license application numbers that appeared in Form Escrows previously provided to Ovation, suggesting that the funds were tied to specific escrow accounts subject to a Form Escrow. In fact, no such accounts existed and the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds, in violation of 8 U.S.C. §§ 2, and 1343.

**dddd. Racketeering Act 82:** Beginning in 2015 and continuing through August 28, 2019, Chicago Title, DuCharme, Elixman and others acting in the interest of Chicago Title knew of and participated in ANI, Champion-Cain, and other ANI principals' numerous acts of transferring over $10,000 of the proceeds of wire fraud from the Concealed Non-Escrow account at Chicago Title to accounts possessed and controlled by Champion-Cain and/or ANI's parent

company, American National Investments, for use in funding the business activities of American National Investments, in violation of 18 U.S.C. §§ 2, 1956, and 1957.

145.   As discussed above, as a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

## Second Cause of Action

### RICO Conspiracy
18 U.S.C. § 1962(d)
Against All Defendants

146.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

147.   This claim alleges a violation of 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

148.   Chicago Title conspired with Champion-Cain to violate 18 U.S.C. § 1962(a) and (c), as described herein.

149.   Champion-Cain has participated as a co-conspirator with Chicago Title in the above listed offenses and has performed those acts in furtherance of the conspiracy.

150.   Chicago Title—through its agents DuCharme and Elixman—and Champion-Cain agreed, whether expressly or tacitly, that some person would commit at least of two predicate acts set forth above in the course of participating in the affairs or operations of the ANI scheme, in violation of 18 U.S.C. § 1962(c).

151.   Chicago Title—through its agents DuCharme and Elixman—and Champion-Cain agreed, whether expressly or tacitly, that some person would commit at least of two predicate acts set forth above in the course using the proceeds of the conduct alleged above to invest in American National Investments, in violation of 18 U.S.C. § 1962(a).

152.   Chicago Title—through its agents DuCharme and Elixman—was aware of the essential scope and nature of and intended to participate in the scheme to corruptly operate ANI to the benefit of Champion-Cain and to use the proceeds of the conduct alleged above to invest in American National Investments.

153.   There was no plausible lawful rationale for the manner in which Chicago Title and its co-conspirators participated in the affairs of the ANI or used the proceeds of the conduct alleged above to invest in American National Investments.

154.   As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Chicago Title and Champion-Cain.

### Third Cause of Action

**Fraud**
Against All Defendants

155.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

156.   Chicago Title, through its agents acting within the scope of their employment made several false statements of fact to Plaintiffs, including, but not limited to:

a.   DuCharme's false oral confirmation, on July 20, 2017, to Ovation's CFO and its Vice President and Head of Accounting that Ovation Finance's money would be safely handled by placing it in an escrow account in Ovation Finance's name.

b.   DuCharme's response to Ovation Finance's January 17, 2018 audit letter, falsely confirming, on January 18, 2018, that "as of the close of business on December 31, 2017, Chicago Title held in escrow $25,000,000 in the name of Ovation Finance Holdings 2 LLC per the License List and Amounts" as set forth in an exhibit to the audit letter.

c.   DuCharme's subsequent oral confirmation to KPMG that her written

confirmation to the January 17, 2018 audit letter was accurate.

d.     DuCharme's April 18, 2018 oral statement that the escrow process was going well and that the Banc of California's funds were being placed in "escrows" that DuCharme had signed off on.

e.     DuCharme's response to Ovation Finance's January 14, 2019 audit letter, falsely confirming, on January 17, 2019, that "as of the close of business on December 31, 2018, Chicago Title held in escrow $25,000,000 in the name of Ovation Finance Holdings 2 LLC per the License List and Amounts" as set forth in an exhibit to the audit letter.

f.     Elixman's September 19, 2019 in-person confirmation to Banc of California confirming that Chicago Title was holding Banc of California's $25 million, and Elixman's description to Banc of California of the extensive reporting and compliance requirements of the State of California.

g.     In connection with wiring funds to Ovation on or about April 9, 2018, March 19, 2019, July 16, 2019, and August 16, 2019, Chicago Title listed in the wiring information liquor license application numbers that appeared in Form Escrows previously provided by ANI to Ovation, implying that the funds were tied to a specific escrow accounts subject to Form Escrows, and concealing that no such accounts existed and that the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds.

h.     In connection with wiring funds to Banc of California on or about March 15, 2018, March 22, 2018, April 26, 2018, May 2, 2018, May 21, 2018, May 30, 2018, June 22, 2018, September 14, 2018, November 1, 2018, February 8, 2019, April 2, 2019, May 14, 2019, June 28, 2019, July 15, 2019, Chicago Title listed in the wiring information liquor license application numbers that appeared in Form Escrows previously provided by ANI to Ovation, implying that the funds were tied to a specific escrow accounts subject to Form Escrows, and

concealing that no such accounts existed and that the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds.

157.   Each of these statements was false at the time it was made. Chicago Title never held any of the deposited funds, much less all of them in Ovation Finance or Banc of California's names, and it never attributed any deposited funds to any specific liquor license escrows on the lists attached to the audit letter.

158.   DuCharme and Elixman knew these statements to be false, because they themselves were involved in administering ANI's escrows under the terms of the Concealed Non-Escrow account, wherein Champion-Cain was regularly withdrawing funds from the escrows. DuCharme was also aware that the Form Escrows were either forged or, at minimum, not being treated as obligatory by ANI. She was further aware that Champion-Cain was impersonating her and Elixman using the @chicagotitleescrows.com e-mail accounts. And DuCharme was aware that the funds in escrow administered under the Concealed Non-Escrow were not earmarked to specific liquor license fee escrows.

159.   DuCharme and Elixman were was also aware that Banc of California and Ovation would, and thus intended them to, rely on their false statements in deciding to fund, to continue to fund, or to increase the amount of loans they were making to Kim Funding for use in the ANI Lending Program that Ovation Finance and Banc of California believed to exist.

160.   Ovation and Banc of California did, in fact, rely on DuCharme's and Elixman's false statements in deciding to fund, to continue to fund, or to increase the amount of loans they were making to Kim Funding for use in the ANI Lending Program that Ovation and Banc of California believed to exist. Ovation and Banc of California relied on the role of Chicago Title—a long-established institution—in coming to the conclusion that their principal would be safe. Had Ovation or Banc of California known that the escrowed funds would not be and/or were not held in an account under their

name, they would have thereafter refused to provide any more loans to Kim Funding, as would have been their right under Ovation's Loan Agreement and Side Agreement and the BoC Loan Documents. Further, Banc of California would not have agreed to increase Kim Funding's line of credit by $10 million in February 2019.

161.   Ovation and Banc of California were injured by DuCharme's deceit. At the time the ANI scheme collapsed, about $23.4 million of Ovation Finance's principal and $35 million of Banc of California's principal—which were supposed to be in safely controlled earmarked accounts controlled by Chicago Title—was lost. Ovation Management also lost significant profits as a result of DuCharme's deceit.

162.   Chicago Title is liable for DuCharme's and Elixman's deceit under the doctrine of *respondeat superior* because, as alleged, *supra*, ¶¶ 109–116, DuCharme's and Elixman's fraud was committed within the scope of their employment with Chicago Title.

163.   Chicago Title is also liable for DuCharme's and Elixman's deceit as a principal of an agent who acted with actual or ostensible authority for Chicago Title in making statements on its behalf. Ovation and Banc of California interacted with DuCharme believing she was a duly authorized escrow agent acting within the scope of her authority when she, among other things, orally confirmed the nature of the arrangements prior to the first wire and signed Ovation Finance's audit confirmations, and represented to Banc of California that its funds were being placed into escrows. Banc of California interacted with DuCharme and Elixman believing they were duly authorized escrow agents acting within the scope of their authority when they, among other things, orally confirmed the nature of the arrangement prior to the line having been fully drawn and prior to the additional $10 million extension of credit in February 2019.

164.   To the extent those acts exceeded the scope of DuCharme's and Elixman's authority, Chicago Title allowed Ovation and Banc of California to believe DuCharme and Elixman possessed the requisite authority, by: (1) holding DuCharme and Elixman

out on Chicago Title's website as authorized escrow agents; (2) permitting DuCharme and Elixman to process millions of dollars of inbound wire transfers without apparent supervision; (3) permitting its escrow officers to facilitate a massive fraud using the means and instrumentalities of the company in such a brazen fashion that it should have been detected by even the most basic internal controls.

165.   Furthermore, Chicago Title had its own duty of disclosure to Plaintiffs, the breach of which is a form of deceit.

166.   Plaintiffs were express third-party beneficiaries to the Form Escrows wherein Chicago Title agreed, among other things, not to release the escrowed funds to any person other than Plaintiffs. Through DuCharme, Elixman, and Schwiebert, Chicago Title was aware—prior to the first funding of any loans by Defendants—that (1) the Form Escrows existed; (2) the Form Escrows' facial provisions bound Chicago Title; and (3) the Form Escrows were for the benefit of third-party depositors into Chicago Title escrow accounts affiliated with ANI and Kim Funding.

167.   Chicago Title, however, must also have been aware that the Form Escrows were either forged or ineffective, since it was treating the Concealed Non-Escrow as the effective agreement governing those accounts.

168.   Under the circumstances—and in particular in its capacity as an escrow holder and thus a putative fiduciary to the beneficiaries of the Form Escrows—Chicago Title owed the beneficiaries of the Form Escrows a duty of candid disclosure. Prior to accepting millions of dollars of wire transfers from Plaintiffs, Chicago Title was obliged to disclose the existence and its view of the primacy of the Concealed Non-Escrow and/or the fraudulence or inefficacy of the Form Agreements. Its failure to do so is deceit under California Civil Code section 1710(3).

169.   Chicago Title failed to disclose these facts with the knowledge that they would have been considered material to Plaintiffs in deciding to fund or to continue to fund loans to Kim Funding for use in the ANI liquor license escrow program that Plaintiffs believed to exist as described by ANI, Kim Funding, and Chicago Title.

Moreover, Chicago Title was making a handsome profit from these transactions for essentially zero work. Had Chicago Title disclosed to Plaintiffs that they were wiring millions of dollars into a glorified checking account controlled by Champion-Cain, the funding from Plaintiffs would never have occurred, and Chicago Title's profits would have run dry. Furthermore, DuCharme and Elixman—the Chicago Title escrow officers carrying out the scheme in their official capacities—were given significant side payments to keep the operation going and their careers likely benefitted from the revenues Chicago Title earned through this fraud.

170.   Plaintiffs did, in fact, rely on Chicago Title's failure to disclose material information regarding the terms of the escrow accounts Plaintiffs were wiring money into. Had Chicago Title disclosed the true nature of the scheme and the terms of the Concealed Non-Escrow, Plaintiffs could and would have exercised their rights under their contracts with Kim Funding and ANI to cease lending money to fund ANI's liquor license escrow program and to demand the accelerated return of their principal.

171.   As discussed above, Plaintiffs were all injured by Chicago Title's failure to disclose material facts.

172.   DuCharme and Elixman acted with oppression, fraud, or malice in defrauding Plaintiffs.

173.   Chicago Title had knowledge of the unfitness of DuCharme and Elixman and acted with reckless disregard of the rights of Olaintiffs in continuing to employ them for years while DuCharme and Elixman participated in the ANI scheme. Moreover, Chicago Title expressly or implicitly authorized or ratified their actions when Schwiebert signed the incumbency certificate.

### Fourth Cause of Action

### Aiding and Abetting Fraud
Against All Defendants

174.   ANI and Champion-Cain committed a massive fraud upon Plaintiffs from the very outset of their relationship.

175.   Among other things, ANI made factual representations in contracts that were not true at the time they were made, for the clear purpose of enticing Plaintiffs to unwittingly lend money to the ANI scheme.

176.   For example, in Ovation Finance's Side Agreement with ANI, ANI recited that it "will establish with Chicago Title ('Escrow Holder') an Escrow Account into which Ovation shall fund Loans (defined in the Loan Agreement) pursuant to the Loan Agreement, which Escrow Account shall be subject to an escrow agreement in which Ovation shall be a third-party beneficiary thereof and owner of the escrow account thereunder (the 'Escrow Agreement'), to accept the proceeds of each Loan."

177.   The Side Letter further explained that "[i]t is expressly understood by ANI that it may only release the Deposit (as defined in the Escrow Agreement) to Ovation and shall not take any action to contravene this Side Letter."

178.   The Side Letter also represented that the "Escrow Agreements executed by ANI and the Escrow Holder constitute valid and legally binding obligations of the parties thereto, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law))."

179.   The Commercial Guaranty, Commercial Security Agreement and Assignment of Deposit Account executed by ANI as part of the Banc of California/Kim Loan Agreement explained that "[ANI] and [Kim Funding] are parties to that certain Funding Agreement, dated as of January 16, 2015, providing for the establishment of escrow accounts by [ANI] from time to time with Chicago Title, a California Corporation ('Escrow Holder') in connection with the representation by [ANI] of applicants for a transfer of a license by the California Department of Alcohol Beverage Control, and the funding of such escrow accounts by [Kim Funding]" and granted to Banc of California a security interest "in all Escrow Accounts funded by [Banc of

California] and established from time to time on or after this date by [ANI] with Escrow Holder in connection with the representation by [ANI] of applicants for a transfer of a license by the California Department of Alcohol Beverage Control, and the funding of such escrow accounts by [Kim Funding]." Ex. 2 at pp. 45, 53.

180.   ANI's contracts with Banc of California similarly represented that Banc of California would be lending funds into specific escrow accounts tied to liquor license transfer applications.

181.   All of these statements were knowingly false when made by ANI.

182.   ANI made the statements with the intent of inducing the reliance of Plaintiffs.

183.   Plaintiffs did, in fact, rely on ANI's false representations in deciding to enter lending agreements with ANI and Kim Funding and to authorize the funding of loans under them.

184.   Chicago Title had actual knowledge of ANI's fraud. Among other things, DuCharme and Elixman knew that Champion-Cain was forging Form Agreements, using a false e-mail address to impersonate them, and operating the ANI escrow accounts under the Concealed Non-Escrow in such a way that, while various creditors were depositing millions of dollars into accounts believed to be controlled under the Form Escrow, Champion-Cain was withdrawing money within her sole discretion.

185.   Further, DuCharme and Elixman's receipt of bribes from Champion-Cain to continue the fraud raises a strong inference that DuCharme and Elixman, and therefore Chicago Title, had actual knowledge of the fraudulent scheme.

186.   Chicago Title also actively participated and facilitated ANI's fraud. Among other things: (1) as described above, while acting in the scope of her authority and employment, DuCharme made various fraudulent statements of her own to facilitate the scheme; (2) Chicago Title failed to disclose facts while under an obligation to do so, under circumstances that permitted the scheme to continue; (3) DuCharme assisted Champion-Cain in signing numerous Form Escrows after a bank's diligence

revealed them to be likely forgeries, perpetuating the scheme; (4) Chicago Title, DuCharme, and Elixman all personally profited from the scheme; (5) DuCharme and Elixman, while acting in the scope of their authority and employment with Chicago Title, processed hundreds of wire transfers into and out of ANI's escrow accounts under the Concealed Non-Escrow, knowingly permitting Champion-Cain and ANI to steal the lenders' principal and accrued interest.

187.   As discussed above, Plaintiffs were injured by Chicago Title aiding and abetting of ANI's fraud.

188.   DuCharme and Elixman acted with oppression, fraud, or malice in aiding and abetting Champion-Cain and ANI's fraud.

189.   Chicago Title had knowledge of the unfitness of DuCharme and Elixman and acted with reckless disregard of the rights of Plaintiffs in continuing to employ DuCharme and Elixman for years while they participated in the ANI scheme. Moreover, Chicago Title expressly or implicitly authorized or ratified their actions when Schwiebert signed the incumbency certificate.

### Fifth Cause of Action

### Negligent Misrepresentation
Against All Defendants

190.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

191.   Chicago Title owed Plaintiffs a duty of care, because, among other things: (1) the contracts under the Form Escrow were specifically intended to protect Plaintiffs; (2) given Chicago Title's knowledge of the Form Escrows, it was foreseeable to Chicago Title that Plaintiffs would suffer harm if their funds were not adequately protected; (3) Plaintiffs' lost principal is a concrete and certain injury; (4) Chicago Title's conduct was integral to the injuries suffered by Plaintiffs; (5) Chicago Title's conduct was morally reprehensible; and (6) imposing a duty of care on Chicago Title and those similarly situated will prevent harm to future beneficiaries of escrow

arrangements.

192.   Chicago Title, through its agents acting within the scope of their employment, made several false statements of fact to Plaintiffs, including, but not limited to:

    a.   DuCharme's false oral confirmation, on July 20, 2017, that Ovation Finance's money would be safely handled by placing it in an escrow account in Ovation Finance's name.

    b.   DuCharme's response to Ovation Finance's January 17, 2018 audit letter, falsely confirming, on January 18, 2018, that "as of the close of business on December 31, 2017, Chicago Title held in escrow $25,000,000 in the name of Ovation Finance Holdings 2 LLC per the License List and Amounts" as set forth in an exhibit to the audit letter.

    c.   Elixman's September 19, 2018 in-person confirmation to Banc of California confirming that Chicago Title was holding Banc of California's $25 million, and Elixman's description to Banc of California of the extensive reporting and compliance requirements of the State of California.

    d.   DuCharme's subsequent oral confirmation to KPMG that her written confirmation to the January 17, 2019 audit letter was accurate.

    e.   DuCharme's April 18, 2018 oral statement that the escrow process was going well and that Banc of California's funds were being placed in "escrows" that DuCharme had signed off on.

    f.   DuCharme's response to Ovation Finance's January 14, 2019 audit letter, falsely confirming, on January 15, 2018, that "as of the close of business on December 31, 2017, Chicago Title held in escrow $25,000,000 in the name of Ovation Finance Holdings 2 LLC per the License List and Amounts" as set forth in an exhibit to the audit letter.

    g.   In connection with wiring funds to Ovation on or about April 9, 2018, March 19, 2019, July 16, 2019, and August 16, 2019, Chicago Title listed

in the wiring information liquor license application numbers that appeared in Form Escrows previously provided by ANI to Ovation, implying that the funds were tied to a specific escrow accounts subject to Form Escrows, and concealing that no such accounts existed and that the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds.

h.  In connection with wiring funds to Banc of California on or about March 15, 2018, March 22, 2018, April 26, 2018, May 2, 2018, May 21, 2018, May 30, 2018, June 22, 2018, September 14, 2018, November 1, 2018, February 8, 2019, April 2, 2019, May 14, 2019, June 28, 2019, July 15, 2019, Chicago Title listed in the wiring information liquor license application numbers that appeared in Form Escrows previously provided by ANI to Ovation, implying that the funds were tied to a specific escrow accounts subject to Form Escrows, and concealing that no such accounts existed and that the source of the funds was instead the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds.

193.  Each of these statements was false at the time it was made. Chicago Title's statements were false because Chicago Title never held any of the deposited funds, much less all of them in Ovation Finance and Banc of California's names, and it never attributed any deposited funds to any specific liquor license escrows on the lists attached to the audit letter.

194.  Chicago Title never had any reasonable basis to believe that these statements were true; and, indeed Chicago Title, through its agents acting within the scope of their employment, knew these statements to be false, because DuCharme herself was involved in administering ANI's escrows under the terms of the Concealed Non-Escrow account, wherein Champion-Cain was regularly withdrawing funds from

the escrows. DuCharme was also aware that the Form Escrows were either forged or, at minimum, not being treated as obligatory by ANI. She was further aware that Champion-Cain was impersonating her using the @chicagotitleescrows.com e-mail account. And DuCharme was aware that the account administered under the Concealed Non-Escrow were not earmarked to specific liquor license fee escrows, and indeed, was not an "escrow" account at all.

195.   Chicago Title, by and through its agents acting within the scope of their employment, was also aware that Plaintiffs would, and thus intended Plaintiffs to, rely on their false statements in deciding to fund or to continue to fund loans to Kim Funding for use in the ANI Loan Program that Plaintiffs believed to exist.

196.   Plaintiffs reasonably relied on Chicago Title's false statements in deciding to fund or to continue to fund loans to Kim Funding for use in the ANI Loan Program that Plaintiffs believed to exist. Plaintiffs relied on the role of Chicago Title—a long-established institution—in coming to the conclusion that their principal would be safe.

197.   Plaintiffs' reliance on Chicago Title's false statements were a substantial factor in causing their harm because had Plaintiffs known that the escrowed funds would not be and/or were not held in an account under its name, Plaintiffs would have thereafter refused to provide any more loans to Kim Funding, as would have been its right under the Loan Agreement and Side Agreement.

198.   As discussed above, Plaintiffs have been harmed as a result of Chicago Title's false statements.

## Sixth Cause of Action

### Breach of Fiduciary Duty
Against All Defendants

199.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

200.   At least since February 1, 2017, acting through agents upon whom Chicago Title endowed with ostensible authority in their interactions with Plaintiffs, Chicago

Title became party to Form Escrows, under which Plaintiffs are express third party beneficiaries.

201.    Under the Form Escrows, Chicago Title, agreed, among other things, not to release the escrowed funds to any persons other than Plaintiffs.

202.    Chicago Title served as the Escrow Holder for these escrow accounts.

203.    As the Escrow Holder, Chicago Title owed a fiduciary duty to Plaintiffs, including, but not limited to, duties to: (1) refrain from acting against Plaintiffs' interests in administering funds Plaintiffs deposited into accounts Plaintiffs believed to be controlled by the Form Escrows; (2) disclosing any materially adverse information, such as the existence of the Concealed Non-Escrow; and (3) exercising reasonable skill and diligence in carrying out the Form Escrow agreements.

204.    Chicago Title, through its agents acting within the scope of their employment, breached its fiduciary duty to Plaintiffs by knowingly wiring Plaintiffs' deposited funds into the Concealed Non-Escrow, from which Champion-Cain was regularly withdrawing funds contrary to the terms of the Form Escrows.

205.    Chicago Title must have been aware that the Form Escrows were either forged or ineffective, since it was treating the Concealed Non-Escrow as the effective agreement governing those accounts.

206.    Despite owing Plaintiffs fiduciary duties, Chicago Title failed to disclose material information regarding the terms of the escrow accounts Plaintiffs were wiring money into.

207.    As discussed above, Plaintiffs have been harmed as a result of Chicago Title's breaches of its fiduciary duties.

### Seventh Cause of Action

**Negligence**
Against All Defendants

208.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

209.   Chicago Title owed Plaintiffs a duty of care, because, among other things: (1) the contracts under the Form Escrow were specifically intended to protect Plaintiffs; (2) given Chicago Title's knowledge of the Form Escrows, it was foreseeable to Chicago Title that Plaintiffs would suffer harm if their funds were not adequately protected; (3) Plaintiffs' lost principal is a concrete and certain injury; (4) Chicago Title's conduct was integral to the injuries suffered by Plaintiffs; (5) Chicago Title's conduct was morally reprehensible; and (6) imposing a duty of care on Chicago Title and those similarly situated will prevent harm to future beneficiaries of escrow arrangements.

210.   Chicago Title's duty of care included, among other things, a duty to monitor its business to ensure that its employees were not using the instrumentalities of the company to carry out and aid and abet fraudulent schemes to deprive Plaintiffs of funds, which Plaintiffs had been led to believe would be deposited into safe escrow accounts at Chicago Title.

211.   Chicago Title breached its duty of care by, among other things, failing to detect or prevent DuCharme and Elixman from using its instrumentalities to carry out ANI's fraudulent scheme.

212.   As discussed above, Plaintiffs have been harmed as a result of Chicago Title's failures to abide by its duty of care.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs pray for the following remedies:

1.   Monetary damages according to proof, including compensatory damages, lost interest, lost profits, and incidental and consequential damages.

2.   Treble damages under 18 U.S.C. § 1964(c).

3.   Punitive damages.

4.   Pre-judgment interest.

5.   Attorneys' fees and costs of suit under 18 U.S.C. § 1964(c), or as otherwise permitted by law.

6.  Any other legal or equitable remedy the Court deems just and appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: October 22, 2019

KIRKLAND & ELLIS LLP

By:      s/ Michael Shipley
Michael Shipley

Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
R. Alexander Pilmer (SBN 166196)
apilmer@kirkland.com
Michael J. Shipley (SBN 233674)
michael.shipley@kirkland.com
333 South Hope Street
Los Angeles, California  90071
Telephone:  (213) 680-8400

*Attorneys for Plaintiffs Ovation Finance Holdings 2 LLC; Ovation Fund Management II, LLC; Banc of California, N.A.*

PACHULSKI STANG ZIEHL & JONES LLP

Dean A. Ziehl (SBN 84529)
dziehl@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90067-4003
Telephone:  (310) 277-6910

*Attorneys for Plaintiff Banc of California, N.A.*

INDEX OF EXHIBITS

| Exhibit | Description | Page Nos. |
|---------|-------------|-----------|
| 1 | Ovation Finance Holdings 2 LLC and KIM Funding, LLC Loan Agreement | 85 -105 |
| 2 | Bank of California Loan Documents | 106 - 167 |
| 3 | Ovation Finance Holdings 2 LLC and ANI Development, LLC Side Agreement | 168 - 173 |
| 4 | Escrow Agreement | 174 - 177 |
| 5 | Table of Escrows Purportedly Funded by Ovation Finance | 178 - 190 |
| 6 | Incumbency Certificate and Authorization of Chicago Title Company | 191 - 192 |
| 7 | December 31, 2018 Escrow Agreement (Holding Funds) | 193 - 195 |
| 8 | February 13, 2019 Escrow Agreement (Holding Funds) | 196 - 362 |
| 9 | Financial Records | 363 - 376 |
| 10 | January 17, 2018 Letter Requesting Escrow Funds Confirmation | 377 - 382 |
| 11 | Bank of California/Kim Amended Loan Documents | 383 - 433 |
| 12 | January 16, 2019 Email Requesting Escrow Funds Confirmation | 434 - 439 |
| 13 | January 17, 2018 Email Attaching Escrow Funds Confirmation | 440 - 443 |

| Exhibit | Description | Page Nos. |
|---|---|---|
| 14 | Table of Escrows Purportedly Funded by Banc of California, N.A. | 444 - 455 |
| 15 | April 17, 2018, E-mail Chain Between L. Mamer, K. Peterson, and G. Champion-Cain | 456 - 460 |
| 16 | April 18, 2018 Contemporaneous Call Notes | 461 - 462 |
| 17 | August 7, 2018 E-mail Chain Between S. Cusato and K. Peterson | 463 - 465 |
| 18 | September 19, 2018 Contemporaneous Call Notes of Mamer | 466 - 468 |
| 19 | September 19, 2018 E-mail from S. Cusato to D. DuCharme, and B. Elixman | 469 - 471 |